PEOPLE v LLOYD

Docket No. 112433. Decided April 13, 1999. On application by the people
for leave to appeal, the Supreme Court, in lieu of granting leave,
reversed the judgment of the Court of Appeals and remanded the
case to that Court for further proceedings.

Raymond E. Lloyd, Jr., was convicted by a jury in the St. Clair Circuit
Court, Peter E. Deegan, J., of first-degree murder and possession of
a firearm during the commission of a felony. The Court of Appeals,
D. E. HOLBROOK, JR., and DOCTOROFF, JJ. (SAAD, P.J., dissenting),
reversed in an unpublished opinion per curiam on the ground that
he was denied effective assistance of counsel (Docket No. 186131).
The people seek leave to appeal.

In an opinion per curiam, signed by Chief Justice WEAVER, and
Justices BRICKLEY, TAYLOR, CORRIGAN, and YOUNG, the Supreme Court
held:

There was no ineffective assistance of counsel. The defendant's
trial attorney exercised professional judgment in determining
which defense had the best chance with the jury, and which was
best supported by the evidence.

A defendant has been deprived of effective assistance of counsel
if counsel's performance was deficient and the deficient perform-
ance prejudiced the defense. In this case, neither conclusion is sup-
ported by the record. It is clear from counsel's testimony and from
the objective facts revealed by the record that he provided repre-
sentation at a professional level. His strategy was entirely reasona-
ble, on the basis of the facts of the case.

Reversed and remanded.

Justice KELLY, joined by Justice CAVANAGH, dissenting, stated that
trial counsel's performance fell below an objective standard of rea-
sonableness and his failure prejudiced the defendant.

Effective assistance of counsel includes the duty to prepare,
investigate, and present all substantial defenses. Trial counsel's per-
formance in this case was ineffective because he failed to obtain
pertinent medical records regarding defendant's mental state, to
properly inform an expert witness of the definitions of insanity and
mental illness, and to properly inform himself regarding the pursuit
of an insanity defense. Defense counsel was also ineffective in fail-

ing to acquaint himself with the subtle but distinctive differences in the defenses of diminished capacity, insanity, and guilty but mentally ill.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *Elwood L. Brown,* Prosecuting Attorney, and *Timothy K. Morris,* Assistant Prosecuting Attorney, for the people.

*Matthew Posner* for the defendant.

PER CURIAM. A jury convicted the defendant of first-degree murder and felony-firearm, but the Court of Appeals reversed on the ground that he was denied effective assistance of trial counsel. We reverse the judgment of the Court of Appeals and remand the case to the Court of Appeals for further consideration.

I

Defendant Raymond E. Lloyd, Jr., has a history of mental health problems. In the summer of 1994, he visited the St. Clair County Community Mental Health Clinic, seeking help for suicidal thoughts, aggressive feelings, and other problems. As a result of post-trial motions, the file contains a number of reports from this agency, indicating that the defendant was a deeply troubled individual.[1]

In August 1994, the defendant was employed on a roofing crew at Port Huron High School. On a day in late August, an argument broke out, and it included a confrontation between the defendant and his supervisor, Steve Johnson. It appeared momentarily that the

_____

[1] During this period, the defendant also paid a visit to Port Huron Hospital, where he described problems of this sort.

argument was over, but the defendant went to his car and retrieved a gun. He shot Mr. Johnson several times, mortally wounding him.

The defendant was charged with open murder and felony-firearm. MCL 750.316, 750.227b; MSA 28.548, 28.424(2).

As a further result of post-trial motions, the file also contains reports and internal memoranda generated during the defendant's stay in jail, while awaiting trial. This material indicates that jail personnel thought him dangerous. One internal memorandum (apparently written by a community mental health worker who assisted at the jail) contains a statement that "there's not a pill in the world that will cure his thinking."

In October 1994, defense counsel moved for a psychiatric examination. The written motion included a statement by counsel that the motion "shall be deemed to be notice of intent to assert the defense of insanity or diminished capacity at the time of trial . . . ."

The prosecutor had no objection, and the circuit court ordered the examination. At the hearing on the motion, defense counsel indicated that insanity "appears to be a defense that will be or may be asserted at the time of trial" and said that the defendant "has insisted that I request on his behalf" a psychiatric examination.

Trial was adjourned while the parties awaited the report of Stephen A. Norris, Ph.D., of the Center for Forensic Psychiatry. In January 1995, he submitted a report, twenty-five pages long, concerning the defendant. His conclusion, explained in significant detail, was that there was no indication that the defendant

was mentally ill at the time of the shooting. Dr. Norris added that "the defendant acknowledged being aware at the time of the alleged illegal conduct that the conduct in question was illegal" and that "the defendant's behavior at the time of the alleged offense indicates a capacity to conform behavior."

In the wake of Dr. Norris' report, the prosecutor filed a notice that the defense of insanity or diminished capacity would be rebutted with Dr. Norris' testimony.[2]

Trial was set to begin on March 14, 1995. On March 13, 1995, the court received from the defendant a handwritten letter, dated several days earlier. He asked for an independent examination, apparently in hopes that a second examiner would come to a different conclusion than Dr. Norris.[3]

The independent examiner was Virginia O'Reilly, O.P., Ph.D., who had come to Port Huron in September 1994 after years of practice in other states. Evaluating the defendant, she administered the Rust Inventory of Schizotypal Cognitions (RISC), as well as

---

[2] Following receipt of Dr. Norris' CFP report, another short hearing was conducted. The parties were not in dispute with regard to the issue of competency to stand trial, but it was agreed that the court should formally determine the question. The court found the defendant competent.

[3] Defense counsel promptly sought an adjournment, filing a motion that included these paragraphs:

3. Based upon the circumstances of the case, the forensic report and numerous conferences with Defendant it was counsel's recommendation to withdraw or abandon the insanity defense and proceed on a state of mind defense theory.

4. Notwithstanding counsel's recommendation, Defendant is aware of his right to an independent psychological examination pursuant to MCLA 768.20a(2) [MSA 28.1043(1)(2)] and became insistent upon asserting that right in the week immediately [preceding] the scheduled [trial] date.

the Minnesota Multiphasic Personality Inventory-2
(MMPI-2).

On the basis of the RISC, Dr. O'Reilly concluded that
the defendant showed " 'substantial disorder of
thought or mood which significantly impairs judg-
ment, behavior, capacity to recognize reality or ability
to cope with the ordinary demands of life.' "[4]

With regard to the MMPI-2, Dr. O'Reilly said that the
test provided a "substantial indication" that the
defendant might have "mental confusion or real psy-
chopathology." However, she also noted that the
defendant had "responded to the MMPI-2 items in an
extremely exaggerated manner, endorsing a wide vari-
ety of rare symptoms and attitudes." She said that
"[t]hese results may stem from a number of factors
that include excessive symptom checking, falsely
claiming psychological problems, low reading level, a
plea for help or a confused state."

Called at trial as a defense witness, Dr. O'Reilly
said, "The diagnosis I'm making, I believe there's
information to indicate that the schizotypal personal-
ity disorder, and the paranoid personality disorder are
possible diagnoses." Asked whether this personality

---

[4]     An individual is legally insane if, as a result of mental illness as
defined in [MCL 330.1400a;  MSA 14.800(400a)] . . . , that person
lacks substantial capacity either to appreciate the nature and qual-
ity or the wrongfulness of his or her conduct or to conform his or
her conduct to the requirements of the law. Mental ill-
ness . . . does not otherwise constitute a defense of legal insanity.
[MCL 768.21a(1); MSA 28.1044(1)(1).]

In turn, mental illness is "a substantial disorder of thought or mood that
significantly impairs judgment, behavior, capacity to recognize reality, or
ability to cope with the ordinary demands of life." In 1995 PA 290,  the
Legislature moved this definition to MCL 330.1400(g); MSA 14.800(400)(g)
from MCL 330.1400a; MSA 14.800(400a) (and substituted the word "that"
for a "which" in the earlier version).

disorder is "the same thing as insanity," Dr. O'Reilly answered, "Not at all."

Testifying on his own behalf, the defendant admitted the shooting, and offered a detailed explanation of the events leading up to the assault. He summed it all up, "I was psychologically out of my head."

The final witness was Dr. Norris, who offered the opinion that the defendant was not mentally ill.

In closing argument, defense counsel offered a strong argument that was based on the testimony of the defendant and Dr. O'Reilly. Disclaiming an intention to persuade the jury that the defendant was wholly innocent, he argued that the defendant did not have the state of mind necessary for a conviction of premeditated murder. It is evident that his argument was designed to bring the jury to the conclusion that this was voluntary manslaughter.

Nevertheless, the jury convicted the defendant, as charged, of first-degree murder and felony-firearm. The circuit court imposed the mandatory life and two-year sentences.

II

The defendant filed a motion for new trial, which the circuit court heard in November 1995. At the hearing, the defendant's trial attorney explained that the defendant had originally wanted him to pursue the defense of insanity. However, his judgment had been that an insanity defense was not consistent with the facts. Counsel said that the events of the shooting, as described by the defendant himself, had been too purposeful:

He had some very explicit reasons for doing what he was doing, and that kind of statement from him totally negates, in my view, any argument of insanity and any argument of diminished capacity, because it was very clear to me in our discussions that he had the ability to formulate specific intent, he had the ability to know right from wrong, he had the ability to conform his conduct to the law because he knew what he was doing. He was engaged in conduct that he had, had set out to perform. That's the problem. And, and because of that, and Ray's explanation of it was very good. It was very good. It made sense. I didn't want to pursue any of that. I mean, I wanted to explore it, I felt I had an obligation to explore it and I felt that we did explore it, but I had decided, and I had talked with Ray and I had let other people know, I mean, this was no big secret, are you going to raise insanity? Are you going to pursue those kinds of issues? And after spending a lot of time talking with him, it was my conclusion that that was not a wise strategy to take for many many years [sic]. And, and that a factual defense that dealt with intent, that dealt with physical evidence, that dealt with the testimony that we'd elicited so far at the time of the preliminary examination, what I expected to be able to prove and show at the time of trial, I felt that that was a much sounder strategy,[5] and it avoided all of the problems and, and the skepticism that goes along with insanity and diminished capacity and state of mind defenses. That all changed. That all changed. That was not our intent. And when I say "our," I do mean "our."

Asked about the role that Dr. Norris' report had played in his evaluation of the viability of the insanity defense, counsel characterized it as a "distant second." He acknowledged that he reached this decision

---

[5] As the prosecuting attorney says in his brief to this Court, "[f]rom the context it is clear that what trial counsel is calling a 'factual' defense would have focused on and emphasized provocation, heat of passion, lack of deliberation, and lack of premeditation."

without reviewing records from the community
mental health agency, the hospital, or the jail.[6]

Although counsel and the defendant had settled on
a defense (lack of premeditation), the defendant then
filed his handwritten request for an independent
examination. That changed the course of the defense
and, in the words of counsel, "things happened from
that point on."

As trial approached, there had been some difficul-
ties in getting Dr. O'Reilly's report, but it was eventu-
ally filed. Her conclusions provided support for a
defense of diminished capacity, but she felt there was
no sign of insanity. Asked about his approach to the
case at that point, counsel explained:

> Well, if the question is, you know, did I make a determi-
> nation that there was no basis for an insanity defense, the
> answer to that is yes. And I did that after talking with Doc-
> tor Norris—or Doctor O'Reilly, because I have an expert.
> She is the one that has to support it, and if she tells me
> after reviewing the jury instruction, and based upon all of
> the experience that she, that she cannot support that, then
> it doesn't exist as far as I'm concerned, as a viable defense.
> So we move on to what we can support, and what she told
> me she would support in connection with the jury instruc-
> tion being the law, was a diminished capacity argument. So
> that's what we prepared.

Counsel's judgment was that a defense of this sort
required firm support from his own expert—he twice
testified that, in his experience, cases are not won
through cross-examination of the other side's expert.

---

[6] Counsel did not give community mental health records to Dr. O'Reilly,
since he did not have them. For the same reason, he did not use them in
his cross-examination of Dr. Norris (who did have access to the records).

On cross-examination at the hearing on the motion for new trial, counsel further explained his view that the insanity defense did not fit the facts of this case:

> After I talked with Mr. Lloyd and he explained to me, I mean what he did and why he did it, he, his description of the events were very detailed to me. His—even though his, his motivation may have been somewhat strange or unusual, that is never a surprise, but after talking with him and, and discussing with him the issue that was foremost in my mind, and that is his intent, and what was he doing and why was he doing it, what was he thinking, it was very clear to me early on that the best strategy was to work within those parameters, because Raymond Lloyd had a very detailed recollection of what occurred. He recalled the events very clearly, and he had some specific reasons for doing what he did. Albeit the reasons may have been misguided reasons, he knew exactly what he was doing[.]
>
> Now, form [sic], taking that and putting that in the context of insanity or diminished capacity, that was a real problem. A real problem. A real problem because he had the ability to formulate specific intent based upon the discussions that I had with him. And if he so testified, that would become fairly clear. With Doctor O'Reilly's testimony there was now another possible explanation.

Counsel also offered his opinion that a defense presentation should be clear, and not premised on alternative theories. Asked whether he had been able to integrate Dr. O'Reilly's view into the defense that he had previously been preparing, counsel replied:

> Somewhat, but not the way I would have liked, and, and let me explain. I had, as you know, I had set out on a strategy that was a factual defense, and if we're really going to talk about a factual defense, then—or, strike that. If we're really going to talk about an insanity or diminished capacity, or state of mind defense, we really don't need to spend a great deal of time talking about the facts. But I've been in

court enough times, and I've argued enough times before a jury that I'm going to do everything I can to not get caught talking out of both sides of my mouth, and I see standing before the jury and, and openly arguing diminished capacity or state of mind defense on the one hand, and then arguing a purely factual defense on the other hand, is being somewhat inconsistent. But what my attempt was, to try to do a little bit of both. And the reason perhaps that this trial dragged out as long as it did is because I felt I did spend a lot of time on the cross-examination of the People's witnesses to attempt to elicit some of the facts that I would have liked to have argued had we gone strictly on a factual defense. At least put that information out there on the record before the jury so that any reasonable person could sit back and say hey, this might be another, another way to look at all of these things. But as a practitioner standing before 12 people, I'm not going to argue both, two different theories, which I view to be inconsistent. I think that that doesn't suit them. So I didn't . . .

Asked a moment later for "an opinion about the viability of insanity or diminished capacities in this county," counsel responded:

My opinion as a practitioner, and specifically as a defense practitioner, it's the last argument that I would want to try to make . . .

The circuit court denied the motion, saying that the record provided no suggestion that counsel "was in any way remiss, was in any way acting on any standard lesser than that that is required of any good, competent, criminal defense lawyer handing [sic] this type of case . . . ."

After the court denied the defendant's motion, he filed an amended motion for new trial, supported by several affidavits. In one of these, appellate counsel recounted Dr. O'Reilly's post-trial conclusion, "I blew

it." In the words of appellate counsel, "She added that she believes that Mr. Lloyd does meet the statutory definition of insanity, that her prior opinion of sanity was not based on the statutory definition but on her opinion that Mr. Lloyd was not necessarily psychotic, and that her error was due on [sic] her unfamiliarity with the specialized definition of insanity under criminal law."

In a separate affidavit, appellate counsel said that he provided Dr. O'Reilly with materials from the community mental health agency and the county jail, and that these materials (which had not been provided before she testified at trial) supported her revised conclusions. Appellate counsel also filed two other affidavits, concerning conversations with the defendant's cousin and mother, both of whom spoke of his mental health problems.

The amended motion was heard in March 1996. The assistant prosecutor argued that the case now involved "dueling experts, with the same expert being on both sides of the issue at different times . . . ." The circuit court again denied the motion.

III

The Court of Appeals reversed.[7] It said that the initial decision to forgo the defense of insanity "was inappropriate since counsel did not review the mental health reports cited by the expert for the prosecution and disregarded all evidence indicating that defendant did, in fact, have mental problems." The Court added that "[d]espite the fact that the reports would have

---

[7] Unpublished opinion per curiam, issued March 31, 1998 (Docket No. 186131).

helped in counsel's cross-examination of the prosecution's expert witness, and would have helped the expert for the defense prepare her testimony, counsel did not even see the reports until after the trial was over."

On this basis, the majority concluded that counsel's performance "was below an objective standard of reasonableness under prevailing professional norms." The Court continued:

> Furthermore, counsel's error was prejudicial. The defense only presented one witness on the diminished capacity defense, Dr. Virginia O'Reilly, and her testimony actually indicated that defendant did not suffer from diminished capacity. O'Reilly testified that defendant could take specifically intended actions, but that his ability to make choices was affected when his sense of danger was triggered. This testimony directly rebuts the defense of diminished capacity, which requires proof that defendant lacked the specific intent necessary for conviction of first-degree murder, *People v Denton*, 138 Mich App 568, 571; 360 NW2d 245 (1984), but supports an insanity defense, which requires proof that defendant lacked the substantial capacity to conform his conduct to the requirements of the law. MCL 768.21a(1); MSA 28.1044(1)(1). Had counsel obtained defendant's mental health records, given them to O'Reilly, informed O'Reilly of the legal definitions of insanity and mental illness, cross-examined the prosecution's expert witness regarding the findings of mental health workers who believed that defendant was insane, subpoenaed the mental health workers that had previously evaluated defendant, and requested that the trial court, as required by MCL 768.29a; MSA 28.1052(1), give the appropriate jury instructions prior to the experts' testimony and again at the conclusion of trial, the jury may well have returned a verdict of guilty but mentally ill. The severity of defendant's situation demanded that his trial counsel take all reasonable steps to prepare and present a viable defense. Since he did not do

so, we reverse defendant's convictions and remand the case for a new trial.

The Court of Appeals provided guidance on an instructional issue for the defendant's new trial, but otherwise declined to address the other issues raised by the defendant.

In dissent, Judge SAAD disputed the majority's conclusion that counsel had failed to provide effective assistance:

> Here, on the day before trial was scheduled, defendant himself chose to abandon the defense strategy of forcing the prosecution to prove that he had premeditated intent to kill, and to pursue a diminished capacity defense. His trial counsel obtained an adjournment and sought a competent, independent clinician to evaluate defendant's mental status. I fail to see any prejudice to defendant in his counsel's failure to pursue an insanity defense where the expert was unable to testify that defendant was legally insane. On the record presented, I would conclude that defense counsel's conduct was objectively reasonable.

Judge SAAD said that he "would affirm on all issues."

The Court of Appeals later denied rehearing, over Judge SAAD's dissent.[8]

The prosecuting attorney has applied to this Court for leave to appeal.

IV

As we explained in *People v Smith*, 456 Mich 543, 556; 581 NW2d 654 (1998), this Court evaluates claims of ineffective assistance of counsel under the stan-

---

[8] Order of the Court of Appeals entered May 29, 1998 (Docket No. 186131).

dard set forth in *Strickland v Washington*, 466 US
668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People
v Pickens*, 446 Mich 298; 521 NW2d 797 (1994). The
standard adopted by the United States Supreme Court
in *Strickland* is this:

> A convicted defendant's claim that counsel's assistance
> was so defective as to require reversal of a convic-
> tion . . . has two components. First, the defendant must
> show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed
> the defendant by the Sixth Amendment. Second, the defend-
> ant must show that the deficient performance prejudiced
> the defense. This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair trial, a
> trial whose result is reliable. Unless a defendant makes
> both showings, it cannot be said that the convic-
> tion . . . resulted from a breakdown in the adversary pro-
> cess that renders the result unreliable. [466 US 687.]

In determining whether counsel's performance fails
that standard, we look to earlier decisions, including
*People v LaVearn*, 448 Mich 207; 528 NW2d 721
(1995), and *People v Johnson*, 451 Mich 115; 545
NW2d 637 (1996).

In *LaVearn*, the defendant was charged with first-
degree (premeditated) murder and felony-firearm.
The prosecution sought to demonstrate that he had
killed a man in Detroit, firing shots from the window
of his automobile. At trial, defense counsel argued to
the jury that the prosecution had presented only cir-
cumstantial evidence, had offered no motive, and had
failed to present evidence of premeditation. Counsel
also emphasized weaknesses in the identification tes-
timony, which had been inconclusive regarding the
race and gender of the person who fired the shots.

Later, the Court of Appeals found that Mr. LaVearn's trial counsel had been ineffective in failing to present a defense of intoxication and failing to call the defendant as a witness.[9] In reversing the judgment of the Court of Appeals and reinstating Mr. LaVearn's convictions, this Court acknowledged that a successful intoxication defense would have reduced the conviction of second-degree murder, but this Court continued its analysis:

> However, intoxication was not the only available defense in this case. As noted above, the prosecution witnesses were unable to agree on the race of the occupants of the car from which the shots were fired, and there was even some uncertainty regarding the gender of the shooter. The trial record gives no hint of a motive, and there was at least a short gap of time between the events immediately surrounding the crime and the defendant's apprehension in Hazel Park. Using these facts, defense counsel argued to the jury that it is far from certain that a person who is driving a car is the same person who controlled a vehicle at some earlier point.
>
> Defense counsel had at least two choices for a defense strategy—intoxication and misidentification. In truth, however, neither had a significant likelihood of success. The potential defense of intoxication would have been weakened by the apparent purposefulness of the defendant's actions. Further, neither the report of the arresting officer nor the hospital records provided any support for an intoxication defense. And, of course, even a successful intoxication defense would have reduced the first-degree murder charge only to second-degree murder.
>
> The more general defense based on reasonable doubt and possible misidentification was also probably doomed from the outset. The shell casings in the defendant's car matched those found at the scene, and the fact that the defendant

---

[9] 201 Mich App 679; 506 NW2d 909 (1993).

himself was evidently shot as he fled the scene provided significant confirmation of the prosecution's case.

Asked at the *Ginther*[10] hearing to explain why misidentification was used as a defense, counsel mentioned the absence of corroborating testimony from the arresting officer or the hospital. He also noted that the intoxication defense "would have put the gun in his [the defendant's] hand." Further, because the defendant admitted to defense counsel a few hours after the arrest that he had fired the shots with the intention of killing someone named "Junior," calling the defendant as a witness could have led to a similar admission being presented to the jury, either on direct examination or in the course of cross-examination. Counsel also testified at the *Ginther* hearing that the defendant had agreed with the defense strategy. [448 Mich 214-215.]

This Court held that Mr. LaVearn had satisfied neither prong of the *Strickland* standard:

In this case, the defendant has satisfied none of these criteria. Defense counsel was faced with a choice between two defenses with significant evidentiary problems. He eschewed the weak defense that offered the possibility of a second-degree murder conviction, in favor of the weak defense that offered the possibility of a complete acquittal and that avoided the ethical problems that would have arisen had the defendant testified that he lacked the intention to kill. Nothing in the materials before us suggests that counsel was "deficient" in making this choice or that the selection significantly affected the outcome of the trial. [448 Mich 216.]

The Court of Appeals also reversed a murder conviction in *Johnson* on the ground of ineffective assistance. Four witnesses had informed the defendant's trial attorney that they were present during the shooting and that the defendant was not the assailant. Two

---

[10] *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973).

other persons known to those four witnesses also could have provided helpful testimony. At a *Ginther* hearing, counsel was given two opportunities to explain his handling of the case. We later characterized this testimony as "remarkably vague and inconclusive," and said that there was "no sign that counsel made a strategic decision not to call the six witnesses to testify regarding the events that occurred on the night of the shooting." 451 Mich 123-124. We thus affirmed:

> A trial is not simply a balance scale—the party with the greater number of witnesses does not always prevail. Yet it is quite significant that the defendant has located *six* supporting witnesses. The circuit court has found that at least four were eyewitnesses who would testify that the defendant did not shoot Mr. Smith. It is true that the defendant's father (a codefendant) and the tavern owner already testified to that effect. However, the exculpatory evidence not presented to the jury is so substantial that we agree with the Court of Appeals that it could have changed the outcome of the trial. [451 Mich 122 (emphasis in original).]

V

Considering the present case in light of *LaVearn* and *Johnson*, we find no ineffective assistance of counsel. The defendant's trial attorney exercised professional judgment in determining which defense had the best chance with the jury, and which was best supported by the evidence.

Counsel set in motion the initial steps for presenting such a defense. He filed the required[11] notice of an insanity defense, and arranged for this case to go

---

[11] MCL 768.20a(1); MSA 28.1043(1)(1).

to the CFP for an evaluation. When, despite an earlier agreement regarding defense strategy, the defendant filed his handwritten request for an independent investigation, counsel obtained the services of an independent examiner. After she, too, concluded that the defendant was not insane, defense counsel presented to the jury a merged defense of no premeditation and diminished capacity.

It is clear from counsel's testimony and from the objective facts revealed by the record that he provided representation at a professional level.[12] His strategy was entirely reasonable, on the basis of the facts of this case. If successful, he might have been able to reduce the judgment to voluntary manslaughter, which would certainly be a favorable verdict on the facts of this case.

*Strickland* and *Pickens* teach that a defendant has been deprived of the effective assistance of counsel if "counsel's performance was deficient" and "the deficient performance prejudiced the defense." 466 US 687. In this instance, neither conclusion is supported by the record. Counsel's performance was entirely adequate, and in no respect prejudicial to the defendant.

The Court of Appeals said that, "[h]ad counsel obtained defendant's mental health records, given them to O'Reilly, informed O'Reilly of the legal definitions of insanity and mental illness, cross-examined the prosecution's expert witness regarding the findings of mental health workers who believed that defendant was insane, subpoenaed the mental health

---

[12] We do not endorse counsel's failure to obtain earlier mental health records, but we do not believe that failure is dispositive.

workers that had previously evaluated defendant, and requested that the trial court, as required by MCL 768.29a; MSA 28.1052(1), give the appropriate jury instructions prior to the experts' testimony and again at the conclusion of trial, the jury may well have returned a verdict of guilty but mentally ill." However, it must be recalled that a person found guilty of first-degree murder, but mentally ill, still must serve life in prison.[13] Thus, failure to obtain such a verdict would scarcely constitute prejudice to the defendant.

Counsel did not fail to provide effective assistance in this case, and the circuit court did not err in denying the defendant's motions for new trial. We therefore reverse the judgment of the Court of Appeals and remand this case to the Court of Appeals for consideration of the issues raised by the defendant but not addressed by that Court.[14] MCR 7.302(F)(1).

WEAVER, C.J., and BRICKLEY, TAYLOR, CORRIGAN, and YOUNG, JJ., concurred.

KELLY, J. (*dissenting*). I disagree with the majority's conclusion that defendant was afforded effective assistance of counsel in this case. In accord with the Court of Appeals decision, I believe that trial counsel's performance fell below an objective standard of reasonableness and that his failure prejudiced defendant. Therefore, I would affirm the Court of Appeals reversal and grant defendant a new trial.

---

[13] MCL 768.36(3), 750.316(1), 791.234(6); MSA 28.1059(3), 28.548(1), 28.2304(6).

[14] On remand, the Court of Appeals shall indicate whether, in light of this disposition, the instructional issue discussed on the final page of the majority opinion is a basis for reversal.

DEFENSE TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE

Trial counsel's performance was ineffective in that he (1) failed to obtain pertinent medical records regarding defendant's mental state, (2) failed to properly inform Dr. O'Reilly of the definitions of insanity and mental illness, and (3) failed to properly inform himself regarding the pursuit of an insanity defense.

Counsel learned from Dr. Norris' report of the existence of Community Mental Health records, Port Huron Hospital records, and county jail records showing defendant's mental state during the months immediately before and after the shooting. However, he never examined them before trial, either for use in cross-examination or for background to enable Dr. O'Reilly to adequately evaluate defendant and prepare her testimony for trial.

Effective assistance of counsel includes the duty to prepare, investigate, and present all substantial defenses. *People v Kelly*, 186 Mich App 524, 526; 465 NW2d 569 (1990); *People v Lewis*, 64 Mich App 175, 183-184; 235 NW2d 100 (1975). As has been aptly stated by the United States Supreme Court, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v Washington*, 466 US 668, 691; 104 S Ct 2052; 80 L Ed 2d 674 (1984). I would hold that defense counsel at trial in the instant case failed in this duty.

When asked why he neglected to examine defendant's mental health records before trial, counsel said: "[I n]ever won a case by cross-examination of the other side's expert." I find this unconvincing. One might be justified in making an informed decision not

to extensively cross-examine an expert after careful review of the expert's proposed testimony and the facts underlying the expert's opinion. But, counsel is not effective who omits to cross-examine an expert because of ignorance of pertinent records on which the expert relied.

Defense counsel's failure to obtain defendant's medical records also led to the inadequate preparation of Dr. O'Reilly. Counsel neither furnished Dr. O'Reilly with defendant's records before she diagnosed him, nor did he inform her of their existence. She has indicated that, had she been made familiar with defendant's mental history, she would have approached her clinical assessment of defendant's mental state differently. Also, after reviewing the records, she found that they do support a finding that defendant was suffering from a mental illness at the time of the shooting. Presumably, her testimony to the jury would have bolstered a defense of guilty but mentally ill or not guilty by reason of insanity.

Defense counsel also failed to provide Dr. O'Reilly with basic information regarding Michigan's criteria for insanity, mental illness, diminished capacity, and a possible defense of guilty but mentally ill. As noted by appellate counsel, this was Dr. O'Reilly's first experience as an expert witness during a trial. Counsel's guidance regarding the legal aspects of Dr. O'Reilly's findings was inadequate under the circumstances.

### THE PREJUDICE TO DEFENDANT

Defense counsel was also ineffective in failing to acquaint himself with the subtle but distinctive differences in the defenses of diminished capacity, insanity, and guilty but mentally ill. He indicated that, in his

professional opinion, it was not a wise strategy to raise an insanity defense. In fact, the record indicates that he was unfamiliar with the defense. By counsel's own admission, this was at most his third referral to the forensic center and the first case in which he actually presented a mental illness defense at trial. Defense counsel admitted that he had not formally consulted with an attorney more experienced in this defense. This failure weakened defendant's chances for a more favorable verdict.

The Court of Appeals correctly noted that defense counsel did not adequately present the defense of diminished capacity. Dr. O'Reilly's testimony, while supposedly offered to establish a diminished capacity defense, actually indicated that defendant did not suffer from diminished capacity. Dr. O'Reilly testified that defendant could take specifically intended actions, but that his ability to make choices was adversely affected when his sense of danger was triggered. This testimony directly rebuts the defense of diminished capacity, which requires proof that a defendant lacked the specific intent necessary for conviction of first-degree murder. *People v Denton*, 138 Mich App 568, 571; 360 NW2d 245 (1984). However, the testimony supports an insanity defense or a finding of mental illness. Defense counsel should have been prepared to fully explore the delicate nuances of this area of the law during direct examination of Dr. O'Reilly. The examination could have led, in turn, to a verdict of guilty but mentally ill or not guilty by reason of insanity.

I disagree with the majority's conclusion that counsel's ineffectiveness was not prejudicial to defendant. Defendant might have been acquitted. Even a verdict

of guilty but mentally ill would have been more favorable, under the circumstances.

I differ with the majority that defense counsel's failure to obtain a verdict of guilty but mentally ill "scarcely constitute[s] prejudice to the defendant." *Ante* at 451. While in truth, in either case, defendant would be subject to incarceration for life, at least one other consequence of a mentally ill guilty verdict is significant to defendant. MCL 768.36(3); MSA 28.1059(3) mandates that a prisoner adjudged guilty but mentally ill must be evaluated and be given such treatment as is psychiatrically indicated. No such mandate exists for one found guilty of first-degree murder, however mentally tortured he may be. As we stated in *People v Booth*, 414 Mich 343, 353-354; 324 NW2d 741 (1982):

> The Legislature's intent in establishing a [guilty but mentally ill] verdict which might be returned by a jury presented with an insanity defense . . . appears to have been twofold: (1) to ensure that criminally responsible but mentally ill defendants obtain professional treatment in "the humane hope of restoring their mental health" while incarcerated or on probation, and, correlatively, (2) to assure the public that a criminally responsible and mentally ill defendant will not be returned to the streets to unleash further violence without having received necessary psychiatric care after sentencing. [Citations omitted.]

While defendant in the instant case would not be eligible for parole if found guilty but mentally ill, he would have the benefit of psychiatric treatment during his prison years.

CAVANAGH, J., concurred with KELLY, J.