# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

NATHANIEL MORRICE,

        Defendant-Appellant.

UNPUBLISHED
December 8, 2016

No. 326469
Ingham Circuit Court
LC No. 14-000640-FC

Before: MURPHY, P.J., and STEPHENS and BOONSTRA, JJ.

PER CURIAM.

Defendant was convicted of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (person under 13, defendant 17 years of age or older), and one count of second-degree CSC (CSC-II), MCL 750.520c(1)(a) (person under 13, defendant 17 years of age or older). He was acquitted of disseminating sexually explicit matter to a minor, MCL 722.675. He was sentenced to 300 to 450 months' imprisonment for each CSC-I conviction and 71 to 180 months' imprisonment for his CSC-II conviction. All sentences run concurrent. He now appeals as of right. For the reasons stated in this opinion, we affirm.

The victim, HH, is defendant's stepdaughter. At trial, HH testified to a progression of sexual abuse by defendant that began when she was 5 years old and ended when she was aged 12. According to HH, at five years' old defendant would enter her bedroom and touch her on her vagina over her clothes. At six years' old defendant made HH perform fellatio and according to HH, she continued to do this every couple of months. HH testified that defendant first vaginally penetrated her when she was 12 years old, that "it hurt really bad," and that she started bleeding from her vagina after the assault even though she was over her menstrual period. According to HH, thereafter defendant engaged in vaginal sex with her about six times and anal sex once. HH recalled that the last time she was assaulted by defendant was in late October 2013, when she was still 12 years old.

## I. RIGHT TO PRESENT A DEFENSE

Defendant first argues that he was deprived the right to present a defense when the trial court ruled that evidence regarding Dan Medina was precluded by the rape-shield statute, MCL 750.520j. We disagree.

-1-

Medina was a man who lived with HH's grandmother during a time when HH spent a significant amount of time at her grandmother's house. According to HH's mother, Medina had been arrested for molesting HH's cousins. HH testified that Medina never assaulted her.

The rape-shield statute is an evidentiary rule that excludes admission of evidence of a victim's sexual activity that is not incident to the alleged sexual assault. *People v Adair*, 452 Mich 473, 478; 550 NW2d 505 (1996). However, if material to a disputed fact, the trial court may admit "[e]vidence of the victim's past sexual conduct with the actor" or "[e]vidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease." MCL 750.520j. Additionally, admitting evidence of a victim's sexual activity "may be required to preserve a defendant's constitutional right to confrontation." *People v Hackett*, 421 Mich 338, 348; 365 NW2d 120 (1984). A court may also admit evidence of this nature to show that a victim's age-inappropriate sexual knowledge was not acquired from the defendant. *People v Morse*, 231 Mich App 424, 436; 586 NW2d 555 (1998).

Defendant's argument is a hybrid of these principles. First, he claims that evidence of Medina's prior sexual-assault convictions is evidence of sexual activity that shows the source of HH's physical condition, which is specifically allowed under MCL 750.520j(1)(b). Second, he claims that this evidence does not even fall under the ambit of the rape-shield statute because it is merely proffered to show HH's age-inappropriate sexual knowledge, independent of any past sexual activity. Finally, defendant ties both arguments together and posits that precluding the evidence ultimately deprived him of his right to present a defense. See *People v Kurr*, 253 Mich App 317, 326; 654 NW2d 651 (2002) ("A criminal defendant has a state and federal constitutional right to present a defense.").

Defendant's argument, however, is based on the erroneous premise that the trial court prohibited the admission of evidence of the underlying facts of Medina's convictions. Defendant never sought to admit the underlying facts of Medina's convictions; consequently, the trial court never ruled that this evidence was inadmissible. Instead, after all the evidence was presented, after both parties gave closing arguments, and after the jury was instructed and began deliberations, the court received a question from the jury about the facts underlying Medina's conviction asking whether the court would have allowed or precluded that evidence. Since neither party offered the evidence, the court's answer to the jury question did not deprive the defendant of a defense that he never proffered.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant postulates several instances where he claims his counsel was ineffective. To preserve an ineffective-assistance-of-counsel claim, a defendant must move for a new trial or a *Ginther*[1] hearing. *People v Cox*, 268 Mich App 440, 453; 709 NW2d 152 (2005). Defendant moved this Court to remand to the trial court for a *Ginther* hearing on some of the alleged instances of ineffective assistance, which this Court denied. *People v Morrice*, unpublished order of the Court of Appeals, entered March 8, 2016 (Docket No. 326469). "When no *Ginther*

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

hearing has been conducted, [this Court's] review of the defendant's claim of ineffective assistance of counsel is limited to mistakes that are apparent on the record." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

An ineffective-assistance-of-counsel claim raises a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). This Court reviews the trial court's factual findings for clear error, but it reviews the trial court's constitutional determinations de novo. *People v Dendel*, 481 Mich 114, 124; 748 NW2d 859, amended on other grounds 481 Mich 1201 (2008). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993).

To show that defense counsel was ineffective and to be afforded a new trial, a defendant must establish (1) that counsel's performance fell below an objective standard of reasonableness and (2) that the defendant was prejudiced as a result of counsel's performance. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). A prejudice showing means that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.*, quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). There is a strong presumption that counsel rendered adequate assistance. *Id.* at 670.

## A. CONFRONTING GUERTIN'S EXPERT TESTIMONY

Defendant first argues that his trial counsel did not properly challenge the testimony from Stephen Guertin, MD on the physical evidence of sexual abuse revealed in his examination of HH. We disagree.

Guertin, who was qualified as an expert in the area of diagnosis and treatment of child sexual abuse, evaluated HH in June 2014. During his physical examination of HH, Guertin found that she had a "deep notch" in her "private area," which he explained was consistent with penial/vaginal intercourse at age 12. He also testified that HH's hymenal opening was "in excess of 25 millimeters or 2.5 centimeters." Guertin said that "if you look at the literature," such a measurement "is not seen in kids unless they are sexually experienced or have suffered intrusive injury." He noted that although neither of these findings alone definitively support the allegations of penile/vaginal intercourse, the presence of both does. However, Guertin acknowledged, "most experts don't use hymenal openings" when evaluating for sexual abuse.

Defendant cites several journal articles in support of his proposition that Guertin's testimony regarding HH's physical condition was inaccurate or incomplete. Defendant suggests that his counsel was ineffective for failing to cross-examine Guertin using the information contained in these articles or call an expert that had knowledge of the information contained in them.

Defendant has not overcome the presumption that his counsel's decisions regarding what evidence to present and pursue constituted sound trial strategy. A primary focus of defendant's theory of defense was that Medina actually abused HH, a suggestion that is consistent with Guertin's testimony that HH exhibited physical signs of sexual abuse. Counsel questioned HH

and her mother about Medina, and both acknowledged that HH spent time at her grandmother's house while Medina was present. HH's mother testified that Medina was a convicted sex offender who had abused at least two of HH's cousins. Counsel also questioned Detective Harrison about Medina's connection to HH and about Harrison's investigation—or, rather, what counsel portrayed as a lack of an investigation—into Medina. Thus, instead of choosing to discredit Guertin's opinion that HH's physical condition supports a finding of sexual abuse, defense counsel chose to accept that opinion and construct a narrative in which someone else with access to HH was the abuser. The decision to argue one defense instead of another is a matter of trial strategy. *People v Lloyd*, 459 Mich 433, 449; 590 NW2d 738 (1999); *People v Hedelsky*, 162 Mich App 382, 387; 412 NW2d 746 (1987).

Defendant also argues that counsel should have more effectively questioned Guertin regarding his conclusion that HH's physical condition evidenced her description of penile/vaginal assault at age 12, given evidence that she suffered a prepubescent fall on the monkey bars and had used tampons. However, trial counsel did elicit testimony from Guertin that the notch could have been caused by a prepubescent injury. Trial counsel also highlighted this point during closing arguments, stating, "But I know one thing Doctor Guertin said. He said the notch that he found could have happened before she was 12, before she started menstruation. And it could have happened when she fell as a child." Defense counsel employed a reasonably sound strategy in choosing to confront Guertin on certain perceived weaknesses in his testimony.[2]

## B. FAILURE TO OBJECT TO HEARSAY STATEMENTS

Defendant also argues that his trial counsel should have objected to several instances of improper hearsay testimony. " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay evidence is not admissible at trial unless an exemption or exception applies. MRE 802. "If, however, the proponent of the evidence offers the statement for a purpose other than to prove the truth of the matter asserted, then the statement, by definition, is not hearsay." *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013); see also MRE 801(c).

### 1. TESTIMONY OF HH'S FRIENDS

Defendant first claims that testimony by AB and CS to statements made by HH regarding the alleged abuse was improper and should have been objected to by trial counsel. AB stated, without objection, that HH told her "that she didn't want to tell anybody because he said don't tell anybody," and that HH did not like defendant because "he raped her." The hearsay testimony that defendant complains that CS gave is her recounting a statement that EB allegedly made after asking HH questions: "she was like you're telling the truth."

---

[2] We also note that trial counsel sought to exclude Guertin's testimony pretrial with a motion in limine.

These statements were not offered to prove the truth of the matters asserted. Instead, the prosecutor used the testimony from these witnesses to explain the circumstances involved and the context behind HH's eventual disclosure of the sexual abuse, including the progression from telling a friend to reporting it to the authorities. AB's testimony regarding HH's desire that she not tell anyone helps the jury to understand why the witnesses waited so long before disclosing the abuse to an adult. Moreover, CS's testimony that EB believed HH was telling the truth was unsolicited testimony during a colloquy about when and why the children finally decided to disclose the abuse to an adult.

As for AB's statement, "he raped her," AB is merely stating what she learned, not stating what HH said. Such a statement may be objectionable due to lack of personal knowledge, but given that an objection may only draw the jury's attention toward this testimony, *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995), counsel's decision to remain silent was reasonable trial strategy.

## 2. GUERTIN'S TESTIMONY ON HH'S DISCLOSURES

Defendant next claims that Guertin's testimony regarding several statements that HH made to him about the sexual assaults, including that defendant was the perpetrator, were inadmissible hearsay. We agree that these statements were inadmissible hearsay for which there was no exception, but find their admission harmless error.

One exception to the hearsay rule includes "[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history . . . ." MRE 803(4). The rationale behind this exception is "(1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *People v Meeboer*, 439 Mich 310, 322; 484 NW2d 621 (1992). Whether this exception applies, i.e., whether the statement was made for purposes of medical treatment or diagnosis and not some other purpose, can be established by determining the trustworthiness of the statement. *Id.* The *Meeboer* Court highlighted several factors indicating trustworthiness:

(1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness, (4) use of terminology unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6) the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate. [*Id.* at 324-325 (citation footnotes omitted).]

-5-

Furthermore, the *Meeboer* Court noted that the perpetrator's identification "is necessary to adequate medical diagnosis and treatment." *Id.* at 322. And, important to the case at hand, the Court explained that corroborating physical evidence of the assault "can support the trustworthiness of the child's statements regarding a sexual assault and aid in the determination whether the statement was made for the purpose of receiving medical care." *Id.* at 326.

HH was 13 years old at the time she made the statements to Guertin, old enough to know the importance of telling the truth during the interview. Guertin did acknowledge asking HH leading questions in his interview. HH used the terms "blow job," "semen," and "cummed," explaining that she learned these terms from defendant. The examination did not occur until approximately seven months after the last assault and approximately six months before trial. Guertin testified that all the information he elicited was for the purposes of diagnosis and treatment, both medically and psychologically, and for the child's protection. Defendant was HH's stepfather, so misidentification, at least in this context, was not a concern. At the time of the statements, there was no known motive for HH to fabricate the allegations.[3]

In *People v Shaw*, ___ Mich App ___; ___NW2d ___ (2016); slip op at 1, "the complainant was 23 years old, [when] she reported to the Lansing Police Department that [the] defendant, her stepfather, had sexually molested her on multiple occasions between the ages of 8 and 16." Relevant to this appeal, defendant Shaw argued that his counsel was ineffective for failing to object to hearsay statements from Dr. Steven Guertin and Detective Elizabeth Reust. *Id.* at ___, ___; slip op at 2, 5. Guertin conducted a physical examination of the complainant seven years after the last alleged incident of abuse. "[I]t was undisputed that prior to [] Guertin's examination, the complainant had been sexual active with her boyfriend." *Id.* at ___; slip op at 5 n 5. Guertin testified to statements told to him by the complainant regarding the abuse. *Id.* at ___; slip op at 3-4. Guertin also testified that, "based on the complainant's medical history, he believed her allegations" and "that his physical findings were consistent with someone who had suffered child sexual abuse." *Id.* at ___; slip op at 5. Detective Reust's testimony vouched for the credibility of the complainant's statements. The detective testified that she "confirmed" the veracity of "background" facts and statements made by the complainant. Detective Reust also testified to the statements the complainant made to Guertin. The Court in *Shaw* noted that Detective Reust sent the complainant to Guertin in furtherance of the investigation against the defendant. *Id.* at ___; slip op at 4.

The *Shaw* Court determined that the above testimony from Guertin and Detective Reust was inadmissible hearsay for which there was no exception and that defense counsel was ineffective for failing to object where there was no strategic advantage for allowing the testimony. *Id.* at ___; slip op at 4-5. The *Shaw* Court reasoned that the "case turned largely on the complainant's credibility" "[g]iven the time that had passed since the alleged abuse stopped,

---

[3] Defense counsel suggested during closing argument that HH may have been motivated to help rid defendant from her life so that her biological father would return. HH testified, though, that she did not think that her stepfather had anything to do with her father's disappearance, and Detective Harrison explained that HH's father remained uninvolved in her life and in this investigation until Child Protective Services contacted him.

the lack of any witnesses to the charged crimes, and the lack of any significant circumstantial proofs." *Id*. at ___; slip op at 4-5. The *Shaw* Court reversed and remanded the defendant's case for a new trial after holding that but for defense counsel's error, there was a reasonably probability that the outcome of defendant Shaw's case would have been different. *Id*. at ___; slip op at 5.

The instant case is strikingly similar to *Shaw*. Here we also have a detective referring the complainant to Guertin for the purposes of furthering the criminal investigation against the defendant, Guertin testifying to inadmissible hearsay statements made by the complainant during a physical examination that was done a significant time after the last alleged instance of abuse, and a detective vouching for the credibility of the complainant. Compared to *Shaw* however, there are marked differences between it and the instant case that compel a result other than reversal. The physical exam in *Shaw* was conducted on the complainant some seven years later, with the complainant having been sexually active in the interim. HH was examined seven months after the last alleged incident of abuse and there was no evidence that she had sex with anyone other than defendant. Indeed, when asked about the possibility of sexually activity with anyone else, Guertin testified that HH was repulsed by the idea of having sex with anyone. Unlike *Shaw*, this case is not a pure credibility contest, and there is physical evidence to corroborate HH's testimony in the form of a deep notch and an abnormally wide hymenal opening, which together, Guertin testified, is indicative of sexual abuse. See *Shaw*, ___ Mich App at ___; slip op at 4-5 (observing that, "Given the time that had passed since the alleged abuse stopped, the lack of any witnesses to the charged crimes, and the lack of any significant circumstantial proofs, this case turned largely on the complainant's credibility.").

Still, Harrison's testimony regarding Guertin's examination is concerning. Harrison testified that she sent HH to Guertin and that she and the doctor "use a team approach" in obtaining all of the relevant information regarding the abuse. She also stated that she knows and understands "the way that he conducts his examinations." A reasonable interpretation of Harrison's testimony is that she understood that Guertin's examination would provide additional information to use in the investigation of defendant.

In any event, defendant has failed to show the requisite prejudice. *Vaughn*, 491 Mich at 669. To show prejudice, a defendant must establish that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.*, quoting *Strickland*, 466 US at 694. Even absent the admission of the hearsay testimony, the result of the proceeding would not have been different. As our Supreme Court stated in *People v Douglas*, 496 Mich 557, 581; 852 NW2d 587 (2014), where "there is other evidence to corroborate the allegations beyond the declarant's statements," "such cumulative hearsay testimony is more likely to be harmless." Such evidence is present here.

## C. FAILURE TO OBJECT TO CREDIBILITY-VOUCHING STATEMENTS

Defendant also argues that counsel was ineffective for not objecting to the testimony of several witnesses that improperly vouched for the credibility of HH and other witnesses.

It "is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *Musser*, 494 Mich at 349. These

comments are not probative because " 'they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence.' " *Id.*, quoting *Connecticut v Taft*, 306 Conn 749, 764; 51 A3d 988 (2012).

Specifically, defendant cites testimony from CS's mother, who testified that HH was "trustworthy" and that she "believed" her allegations; testimony from CS that HH was "a very trustworthy person" and that EB was "a trusted one of us"; and Harrison's description of the forensic interviewing process as "truth-seeking," as well as the following explanation for why she determined that HH was not lying:

> [S]he described a progression of events to me which is pretty difficult if not impossible to. I mean it's not indicative of lying or coaching when she knows, has an unexplained knowledge. Like she's talking about starting out as touching, then oral sex, then vaginal penetration. She also said a couple things to me that really stuck out as far as like talking about ejaculation. She didn't use that word though. But when she's talking about that like that it was on her stomach and talking about the taste and in talking about the towel, that's definitely unexplained sexual knowledge. So it all kind of, that's part of the hypothesis testing about like is she lying for attention.

These statements contributed nothing to the context of the witnesses' roles in the pertinent facts of the allegations; they were merely the opinions of the witnesses themselves regarding credibility, which is prohibited unless the witnesses' credibility has been attacked. See MRE 608(a). While it is arguable that the statement of CS and her mother were isolated and a lack of objection could be considered sound trial strategy so as to not draw attention to them, see *Bahoda*, 448 Mich at 287 n 54, the same cannot be said for Harrison's statements. Harrison was allowed to describe in detail and elaborate on why she ruled out one of her alternate hypotheses, i.e., that HH was lying about the abuse. Thus, Harrison was informing the jury why she believes HH is being truthful, an issue that is solely for the jury. *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007) ("It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury."). We can discern no reasonable strategic reason that defense counsel failed to lodge an objection during Harrison's elaborative statement (or following the prosecutor's question regarding what Harrison did to explore the possibility that HH was lying).

However, once again prejudice has not been shown. In arguing that counsel's deficient performance affected the outcome of his trial, defendant again misrepresents the evidence in his case as boiling down to only a contest of pure credibility. True, HH was the accuser and consequently an essential witness in this case. However, there was additional physical evidence beyond the verbal allegations that HH was sexually abused. Moreover, defendant acknowledged this evidence by focusing much of his trial strategy around the failure to sufficiently investigate Medina. This was a reasonable defense strategy. Even if defense counsel had objected to the

improper statements, it is unlikely that the strategy would have changed.

Affirmed.

/s/ William B. Murphy
/s/ Cynthia Diane Stephens
/s/ Mark T. Boonstra