RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BURT LANCASTER,

*Petitioner-Appellant,*

     *v.*

No. 10-2112

LINDA METRISH, MICHIGAN DEPARTMENT OF
CORRECTIONS, and PATRICIA L. CARUSO,
Director,

*Respondents-Appellees.*

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:07-cv-13692—Avern Cohn, District Judge.

Decided and Filed: June 29, 2012

Before: BATCHELDER, Chief Judge; CLAY and GILMAN, Circuit Judges.

———————————

## COUNSEL

**ON BRIEF:** Kenneth M. Mogill, MOGILL, POSNER & COHEN, Lake Orion,
Michigan, for Appellant. Laura Moody, OFFICE OF THE ATTORNEY GENERAL,
Lansing, Michigan, for Appellees.

     GILMAN, J., delivered the opinion of the court, in which CLAY, J., joined.
BATCHELDER, C. J. (pp. 21–25), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

     RONALD LEE GILMAN, Circuit Judge. Burt Lancaster appeals from the
district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254.
In 1993, Lancaster was charged by the state of Michigan with first-degree murder and
with possession of a firearm in the commission of a felony. At his 1994 jury trial, he

1

was convicted on both counts despite his asserted defenses of insanity and diminished capacity. The judgment was later overturned, however, due to an error by the State during jury selection (a *Batson* violation).

When Lancaster was retried in 2005, he opted to be tried without a jury. Lancaster had planned to limit his defense in the second trial to that of diminished capacity. But the trial court prohibited Lancaster from asserting the defense because, in the interim between his two trials, the Michigan Supreme Court had abolished the diminished-capacity defense in the case of *People v. Carpenter*, 627 N.W.2d 276 (Mich. 2001). Lancaster was once again convicted and sentenced to life plus an additional two years in prison.

In his petition for a writ of habeas corpus, Lancaster claims that his right to due process was violated by the state court's retroactive application of *Carpenter*. The district court denied his petition. For the reasons set forth below, we **REVERSE** the decision of the district court and **GRANT** Lancaster's petition for a writ of habeas corpus unless the State commences a new trial within 180 days of this Opinion in which Lancaster is permitted to assert the defense of diminished capacity.

## I. BACKGROUND

On April 23, 1993, Lancaster, a former Detroit police officer with a long history of mental illness, shot and killed his girlfriend, Toni King, in the parking lot of a shopping plaza in Southfield, Michigan. He was charged with first-degree murder, in violation of M.C.L. § 750.316, and with possessing a firearm in the commission of a felony, in violation of M.C.L. § 750.227. At his 1994 jury trial in state court, Lancaster admitted that he had killed his girlfriend, but asserted the defenses of insanity and diminished capacity. The jury rejected these defenses and convicted him on both counts.

After exhausting his appeals in state court, Lancaster filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. He raised several claims, including a claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), in which he contended that the State had used one of its peremptory challenges

to improperly exclude an African-American juror based on the juror's race. The district court conditionally granted the writ on the basis of Lancaster's *Batson* claim. This court affirmed. *Lancaster v. Adams*, 324 F.3d 423, 427 (6th Cir. 2003).

Lancaster was retried in state court in 2005 on the same charges. This time, he waived his right to a jury trial. He also limited his defense to that of diminished capacity, abandoning his alternative defense of insanity. The diminished-capacity defense

> allows a defendant, even though legally sane, to offer evidence of some mental abnormality to negate the specific intent required to commit a particular crime. The theory is that if because of mental disease or defect a defendant cannot form the specific state of mind required as an essential element of a crime, he may be convicted only of a lower grade of the offense not requiring that particular mental element.

*Carpenter*, 627 N.W.2d at 280 (brackets, citation, and internal quotation marks omitted).

In *Carpenter*, however, the Michigan Supreme Court held that diminished capacity was no longer a valid defense under Michigan law as a result of the 1975 enactment by the state legislature of a statutory framework for the insanity defense. *Id.* at 285. The Michigan trial court in Lancaster's case decided that *Carpenter* applied retroactively, thus prohibiting Lancaster from asserting the diminished-capacity defense at his second trial. Lancaster sought an interlocutory appeal from the trial court's order that precluded him from pursuing the defense of diminished capacity. But both the Michigan Court of Appeals and the Michigan Supreme Court declined to consider the merits of the appeal. Lancaster was subsequently convicted on both charges at the conclusion of the bench trial. He was sentenced to life imprisonment for the murder conviction, to be served consecutively to two years' imprisonment for the felony-firearm conviction.

After exhausting his state-court remedies, Lancaster filed a § 2254 habeas petition in the district court. In his petition, he argues that the Michigan Supreme Court's abolition of the diminished-capacity defense was a substantive change in state law and that, by applying the change retroactively, the trial court violated his right to due

process under the Fifth and Fourteenth Amendments to the U.S. Constitution. The district court denied Lancaster's petition, reasoning that the abolition of the diminished-capacity defense was foreseeable because the defense was not well-established in Michigan law. It then granted a certificate of appealability on the issue, and this timely appeal followed.

## II. ANALYSIS

### A.    Standard of review

"We review the district court's legal conclusions in a habeas proceeding de novo and its factual findings under the clear-error standard." *Davis v. Lafler*, 658 F.3d 525, 530 (6th Cir. 2011). "Because the Petition [in this case] was filed after April 24, 1996, the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ('AEDPA'), our review of the decisions of the state trial and appellate courts is governed by AEDPA." *Lancaster v. Adams*, 324 F.3d 423, 428 (6th Cir. 2003).

AEDPA provides in pertinent part that

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1). "A state court decision may be an 'unreasonable application' of clearly established Supreme Court precedent 'if the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case' or 'if the state court . . . unreasonably refuses to extend that principle to a new context where it should apply.'" *Lancaster*, 324 F.3d at 429 (alterations omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000)).

**B.     The retroactive application of *Carpenter* violated Lancaster's right to due process**

Lancaster claims that his right to due process was violated by the state trial court's retroactive application of the Michigan Supreme Court's 2001 decision in *Carpenter*. The United States Supreme Court "has often recognized the basic [due process] principle that a criminal statute must give fair warning of the conduct that it makes a crime." *Rogers v. Tennessee*, 532 U.S. 451, 457 (2001) (internal quotation marks omitted). This "federal right turns upon . . . the appearance to the individual of the status of state law as of that moment [when the crime was allegedly committed]." *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964) (internal quotation marks omitted).

"[A] judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Rogers*, 532 U.S. at 462 (quoting *Bouie*, 378 U.S. at 354). Put another way, "[w]hen a state court overrules a consistent line" of decisions interpreting a criminal statute or common law and applies that decision "retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law." *Bouie*, 378 U.S. at 354-55. This tenet of due process is the judicial counterpart to the Ex Post Facto Clause found in Article I of the U.S. Constitution, which applies only to legislatures. *Rogers*, 532 U.S. at 456 ("[L]imitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process."). "Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, s[.] 10, of the Constitution forbids." *Bouie*, 378 U.S. at 353.

Here, Lancaster was deprived of the defense of diminished capacity by the retroactive application of *Carpenter*. The Ex Post Facto Clause prohibits a state legislature from making certain changes in criminal statutes retroactive, including changes that "deprive[] one charged with crime of any defense available according to law at the time when the act was committed." *Collins v. Youngblood*, 497 U.S. 37, 42

(1990) (internal quotation marks omitted). Because in this case the Michigan Supreme Court, not the state legislature, eliminated the defense of diminished capacity, Lancaster must show that the Court's abolition of the defense was unforeseeable in order to succeed on his due process claim. *See Bouie*, 378 U.S. at 353-54. That is, he must demonstrate that *Carpenter* unexpectedly abrogated a consistent line of decisions recognizing the defense.

The district court concluded that the demise of the diminished-capacity defense was foreseeable because

> the Michigan Supreme Court acknowledged in passing the concept of the diminished capacity defense, but it never specifically authorized its use in the Michigan courts. Thus, although diminished capacity has been utilized as a defense since 1973, it has never been codified by the legislature as a viable defense or formally adopted by the state's highest court. As such, the defense has never enjoyed a solid foothold in Michigan's criminal law.

*Lancaster v. Metrish*, 735 F. Supp. 2d 750, 757 (E.D. Mich. 2010) (citations omitted). But the district court materially understated the "foothold" that the diminished-capacity defense had established in Michigan law and failed to recognize the plethora of state appellate court cases recognizing the validity of the defense.

### 1.    *The defense of diminished capacity was well-established under Michigan law prior to* **Carpenter**

### a.    *Michigan Court of Appeals*

Diminished capacity was first recognized as a defense in *People v. Lynch*, 208 N.W.2d 656 (Mich. Ct. App. 1973), 28 years before *Carpenter* was decided. The court in *Lynch* held that the trial court erred in prohibiting the defendant charged with first-degree murder from presenting medical evidence "of diminished or partial responsibility." *Id.* at 662; *see also Carpenter*, 627 N.W.2d at 281 (recognizing that *Lynch* "introduced to Michigan the diminished capacity defense" as a "defense separate from legal insanity").

Then, in 1975, the Michigan legislature enacted a statutory framework for the defense of insanity.  *See People v. Mangiapane*, 271 N.W.2d 240, 246-49 (Mich. Ct. App. 1978) (holding that 1975 Public Act Nos. 179 and 180 modified the rule established in *Lynch*).  One of the newly enacted statutes codified the insanity defense for the first time:

> **768.21a        Persons deemed legally insane.  [M.S.A. 28.1044(1)]**
>
> Sec. 21a.  (1) A person is legally insane if, as a result of mental illness . . . , that person lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
>
> (2) A person who is under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his alleged offense shall not thereby be deemed to have been legally insane.

1975 Mich. Pub. Acts 386-87.

Diminished capacity was not specifically addressed in this statute, but in 1978, the Michigan Court of Appeals held "that the defense known as diminished capacity comes within th[e] codified definition of legal insanity" and that, in asserting the diminished-capacity defense, the defendant must follow the same procedures as outlined for the insanity defense in the statute.  *Mangiapane*, 271 N.W.2d at 249.  Thus, despite the new statutory framework, the court continued to recognize diminished capacity as a legitimate defense.  *See People v. Mette*, 621 N.W.2d 713, 719 (Mich. App. Ct. 2000) (observing that "[t]his court has consistently held that the defense of diminished capacity comes within the codified definition of legal insanity and is subject to the same procedural requirements" (collecting cases)).

The Michigan Supreme Court acknowledged this history in *Carpenter*:

> The [Michigan] Court of Appeals['] decision in *Mangiapane* was then followed by a series of decisions continuing to address diminished capacity defense as a form of the statutory insanity defense.  *See, e.g.*, *People v. Denton*, 138 Mich. App. 568, 360 N.W.2d 245 (1984); *People v. Anderson*, 166 Mich. App. 455, 421 N.W.2d 200 (1988).

*Carpenter*, 627 N.W.2d at 282; *see also People v. Lipps*, 421 N.W.2d 586, 589-90 (Mich. App. Ct. 1988) ("Conditions which are recognized as defenses to [a specific intent] crime include intoxication, insanity and diminished capacity"); *People v. Paris*, 420 N.W.2d 184, 186 (Mich. App. Ct. 1988) (holding that the prosecutor does not have general discovery rights because Michigan law requires a defendant "to disclose [only] a defense of insanity or diminished capacity" (citing M.C.L. § 768.20a)); *People v. Kvam*, 408 N.W.2d 71, 74 (Mich. App. Ct. 1987) (explaining that "[t]he diminished capacity defense is merely one aspect of whether a defendant has the requisite intent"); *People v. Jones*, 390 N.W.2d 189, 191 (Mich. App. Ct. 1986) (holding that "once evidence of diminished capacity is introduced by a defendant, the prosecution bears the burden of establishing the defendant's 'normal capacity'"). When Lancaster committed his crimes in 1993, therefore, the Michigan Court of Appeals had consistently upheld the use of the diminished-capacity defense.

Absent from the 1975 statutory framework, however, was any indication of which party had the burden of proof required to demonstrate insanity. *See People v. McRunels*, 603 N.W.2d 95, 98 (Mich. Ct. App. 1999) (remarking that "the [1975] insanity statute made no reference to the burden of proof," so the burden of proof was "governed by common law"). The Michigan Supreme Court thus continued the common-law method of shifting the burden of proof that was established well before the insanity defense was codified. *See People v. Savoie*, 349 N.W.2d 139, 143 (Mich. 1984) (citing cases as early as 1868 for the burden-shifting framework of the insanity defense).

Under this burden-shifting framework, "[a] criminal defendant is presumptively sane. However, once there is any evidence introduced of insanity, the burden of proof is on the prosecution to establish defendant's sanity beyond a reasonable doubt." *Id.* at 143. This caused the Michigan Court of Appeals to hold that the same burden-shifting framework should be applied to both the insanity and diminished-capacity defenses. *See Denton*, 360 N.W.2d at 247 (reasoning that because all other procedures for the two defenses were the same, the allocation of the burden of proof should follow suit).

In 1994, however, the legislature amended the statutory definition of the insanity defense and shifted the burden of proof entirely to the defendant. Insanity was declared an affirmative defense that the defendant must prove "by a preponderance of the evidence." Mich. Comp. Laws § 768.21a(3); *see* 1994 Mich. Pub. Acts 251-52 (containing the 1994 amendments); *see also McRunels*, 603 N.W.2d at 99-100 (holding that the 1994 amendments changed the burden of proof for the defense of insanity). Consistent with its earlier decisions, the Michigan Court of Appeals held in 2000 that the insanity-defense statute as amended continued to apply to the diminished-capacity defense. *Mette*, 621 N.W.2d at 719 (holding that the trial court correctly instructed the jury that the "defendant had to establish by evidence that outweighed the evidence against him that he lacked the capacity to form specific intent"); *see also Carpenter*, 627 N.W.2d at 282 ("[T]he Court of Appeals held that a defendant seeking to present a diminished capacity defense bears the burden of establishing such a defense by a preponderance of the evidence.").

### b.    Michigan Supreme Court

Unlike the Michigan Court of Appeals, the Michigan Supreme Court never directly addressed the validity of a defense of diminished capacity based on mental illness or disability before *Carpenter*, but the Court conceded in that case that it had "several times acknowledged in passing the concept of the diminished capacity defense." *Id.* at 281. The Court first did so in *People v. Ramsey*, 375 N.W.2d 297 (Mich. 1985).

*Ramsey* was a consolidated appeal of two defendants who challenged the constitutionality of Michigan's "guilty but mentally ill" verdict. One of the defendants, Ramsey, was convicted of second-degree murder following a bench trial. As an alternative to his constitutional challenge, he argued that by being "guilty but mentally ill," he lacked the requisite intent for second-degree murder as a matter of law. The Court rejected Ramsey's contention with the following explanation:

> "A defendant in a criminal case, at the time he engaged in the conduct giving rise to the charges against him, may have been suffering from an abnormal mental condition which was not of a kind or character to afford him a successful insanity defense . . . . But, while this

defendant is therefore ineligible for a finding of not guilty by reason of insanity, his mental abnormality may nonetheless be a most relevant consideration in the determination of whether he is guilty of the crime charged. Under the doctrine referred to as partial responsibility, diminished responsibility, or (somewhat less accurately) partial insanity, evidence concerning the defendant's mental condition is admissible on the question of whether the defendant had the mental state which is an element of the offense with which he is charged."

Thus, while his mental illness may be a consideration in evaluating the requisite state of mind for the crime charged, we decline to accept Ramsey's invitation to hold that a finding of mental illness negates malice aforethought as a matter of law.

. . . .

Had the trial judge indicated a refusal to consider the defendant's mental illness as a diminishing factor in his decision of whether defendant possessed the requisite malice aforethought, we would find it necessary to address the question of the extent to which mental illness could diminish the intent requirement for second-degree murder. But he did not.

*Id.* at 304 (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 42, at 326 (1972)). The Court thus acknowledged the substantive components of the diminished-capacity defense (albeit under a different name), but left open the questions of whether, and to what degree, the defense would apply to a general-intent crime like second-degree murder. *See also People v. Langworthy*, 331 N.W.2d 171, 180 (Mich. 1982) (holding that, unlike the specific-intent crime of first-degree murder, second-degree murder is a general-intent crime for which the defense of voluntary intoxication is not available).

A year after *Ramsey*, the Michigan Supreme Court revisited the use of the diminished-capacity defense in *People v. Fernandez*, 398 N.W.2d 311 (Mich. 1986). Fernandez challenged his conviction of conspiracy to commit first-degree murder on the basis that the trial court erred by refusing to instruct the jury on the lesser-included offense of conspiracy to commit second-degree murder. But the Michigan courts had never before determined whether such a charge was recognized under Michigan law. Holding that a conspiracy to commit second-degree murder was a "logical

impossibility," the Michigan Court of Appeals affirmed Fernandez's conviction. *People v. Fernandez*, 372 N.W.2d 567, 571 (Mich. App. Ct. 1985). It explained:

> A conspiracy is a combination or agreement with others to do something unlawful. Second-degree murder is an unlawful killing and a purpose to kill without that deliberation and premeditation which characterize murder in the first degree. For a conspiracy conviction to lie, there must be proof of two specific intents: (1) the intent to agree (conspire) and (2) the intent to accomplish the substantive offense. However, second-degree murder is not a "specific intent" crime.

*Id.* at 569-70.

In reviewing the Michigan Court of Appeals' decision in *Fernandez*, the Michigan Supreme Court examined California caselaw because California was the only state to have "expressly discussed whether such a crime can logically exist." 398 N.W.2d at 319-20. "[T]he California Supreme Court held that evidence of diminished capacity could negate the specific intent required for conspiracy to commit first-degree murder, reducing the crime to conspiracy to commit second-degree murder or manslaughter, in the appropriate case." *Id.* at 320.

"[B]ecause no allegations of diminished capacity were made in this case," the Michigan Supreme Court declined to rule on whether it would adopt the California holding on the issue. *Id.* But the Court acknowledged that,

> [w]hile the California rule of the effect of diminished capacity on degrees of homicides varies significantly from the Michigan rule, the possibility exists under Michigan law that diminished capacity might possibly militate for the existence of the charge of conspiracy to commit second-degree murder.

*Id.* (citation omitted). Importantly, the phrase "the California rule of the effect of diminished capacity . . . varies significantly from the Michigan rule" suggests that the Court recognized an extant diminished-capacity defense in Michigan.

The Michigan Supreme Court next mentioned the diminished-capacity defense in the context of an ineffective-assistance-of-counsel claim in *People v. Griffin*, 444 N.W.2d 139 (Mich. 1989). Griffin asserted that his "trial counsel was ineffective for

failing to . . . explore the defenses of diminished capacity and insanity." *Id.* at 140. The Court found that he had "identified an issue . . . for which a testimonial record must be developed" and remanded the case for an evidentiary hearing on the issue. *Id.* Although the Court did not rule directly on the validity of the diminished-capacity defense, its decision to remand for an evidentiary hearing suggests that it believed, at least in its cursory review, that counsel could have been found ineffective for failing to assert the defense. If diminished capacity had been deemed an illegitimate defense, then counsel could not be faulted for failing to assert it, and no hearing on that issue would have been necessary.

The Michigan Supreme Court caselaw in the years following *Griffin* supports this reading of the case. In 1994, the Court held that "a necessary component of the diminished capacity defense is that the defendant was mentally ill." *People v. Pickens*, 521 N.W.2d 797, 812 (Mich. 1994). More recently, in *People v. Lloyd*, 590 N.W.2d 738 (Mich. 1999), the Court concluded that defense counsel's strategy to "present[] to the jury a merged defense of no premeditation and diminished capacity" instead of the defense of insanity "was entirely reasonable." *Id.* at 745. Indeed, the Michigan Court of Appeals held that *Lloyd* affirmatively "recognized the propriety of a diminished capacity defense to a charge of first-degree premeditated murder." *People v. Mette*, 621 N.W.2d 713, 718-19 (Mich. App. Ct. 2000).

Even in *Carpenter* itself, the Michigan Supreme Court suggested that diminished capacity was previously a valid defense, titling a section of its opinion "The *Continued* Viability of the Diminished Capacity Defense in Michigan." 627 N.W.2d at 282 (emphasis added). Lancaster had indeed utilized this well-recognized defense at his first trial in 1994, a defense that had been developed by over 20 years of Michigan court precedent at the time and that continued to be recognized right up to *Carpenter* in 2001.

### c.      *Michigan's standard jury instructions*

The belief that diminished capacity was a legitimate defense was so widely held by the Michigan legal community that, before *Carpenter*, the Michigan State Bar's Criminal Jury Instructions included an instruction on the defense. Commentary

accompanying the instruction noted that "[t]he defense of diminished capacity is available when the defendant's mental impairment leaves him or her unable to form the specific intent needed to commit the crime." Standing Comm. on Std. Crim. Jury Instructions, Mich. State Bar, 1 *Mich. Crim. Jury Instructions* 6.3, at 6-11 (2d ed. 1994) (This instruction was removed only after *Carpenter* was decided.).

The district court below discounted the importance of the standard instruction on diminished capacity because the Michigan Criminal Jury Instructions are not officially sanctioned by the Michigan Supreme Court. But the use of these Standard Criminal Jury Instructions "is urged by the [Michigan] Supreme Court, according to Administrative Order 1977-1, 399 Mich 1xxii." *News & Notices: From the Committee on Standard Criminal Jury Instructions*, 78 Mich. B.J. 214, 214 (1999).

Furthermore, the instruction demonstrates that the Michigan State Bar, the author of the instructions, recognized diminished capacity as a viable defense under Michigan criminal law prior to *Carpenter*. The instructions "are intended to accurately reflect the law in a format which is understandable to jurors." *Id.* In addition, the instructions indicate acceptance of the defense by Michigan's legal community. They are "used extensively by Michigan judges, prosecutors, and defense attorneys to instruct juries in criminal cases fairly and accurately." Standing Comm. on Std. Crim. Jury Instructions, Mich. State Bar, 1 *Mich. Criminal Jury Instructions*, at ix (2d ed. 1989). Even state prosecutors assumed that the diminished-capacity defense was a legitimate one, as indicated by the following comment made during closing argument by a prosecutor in *People v. Garfield*, 420 N.W.2d 124 (Mich. App. Ct. 1988): "[T]here are other defenses such as insanity or diminished capacity which are not before this Court . . . ." *Id.* at 128. Thus, contrary to the district court's conclusion, the status of diminished capacity as a defense in Michigan was quite well-established when Lancaster committed his offenses in 1993.

### 2.     *The holding in* **Rogers v. Tennessee** *is inapposite*

As a result of the district court undervaluing the "foothold" that the diminished-capacity defense had established in Michigan law, it incorrectly concluded that this case is "strikingly similar to" *Rogers v. Tennessee*, 532 U.S. 451 (2001), in which the United States Supreme Court held that the abolition of a Tennessee common-law defense was foreseeable.  But *Rogers* is readily distinguishable.

Rogers was convicted of second-degree murder for stabbing someone who died 15 months later as a result of medical complications caused by the attack.  He appealed, contending that the common-law year-and-a-day rule precluded his conviction.  This historic rule required that "no defendant could be convicted of murder unless his victim had died by the defendant's act within a year and a day."  *Rogers*, 532 U.S. at 453.  On appeal, the Tennessee Supreme Court "found that the original reasons for recognizing the rule no longer exist[ed]," formally abolished it, and denied Rogers's appeal on the ground that the rule no longer existed.  *Id.* at 455.

The United States Supreme Court affirmed, holding that the retroactive application of the abolition of the year-and-the-day rule to Rogers's case did not violate his right to due process.  *Id.*  In so doing, the Court reasoned that "the Tennessee court's abolition of the year and a day rule was not unexpected and indefensible," *id.* at 462, and further explained:

> The year and a day rule is widely viewed as an outdated relic of the common law. Petitioner does not even so much as hint that good reasons exist for retaining the rule[.] . . . [A]s practically every court recently to have considered the rule has noted, advances in medical and related science have so undermined the usefulness of the rule as to render it without question obsolete.
>
> . . . .
>
> Finally, and perhaps most importantly, at the time of [Rogers]'s crime the year and a day rule had only the most tenuous foothold as part of the criminal law of the State of Tennessee.  The rule did not exist as part of Tennessee's statutory criminal code.  And while the Supreme Court of Tennessee concluded that the rule persisted at common law, it also pointedly observed that the rule had never once served as a ground

> of decision in any prosecution for murder in the State. Indeed, in all the reported Tennessee cases, the rule has been mentioned only three times, and each time in dicta.

*Id.* at 462-64 (citations omitted).

Applying *Rogers* to this case, the district court concluded that, just like the year-and-a-day rule, the diminished-capacity defense was ripe for abolition. But none of the United States Supreme Court's reasons for concluding that the elimination of the year-and-a-day rule was foreseeable pertain to Michigan's diminished-capacity defense.

First, unlike the year-and-a-day rule, the diminished-capacity defense had been in existence only since 1973. It was anything but an "outdated relic" rendered "obsolete" by advances in medical and related sciences at the time of Lancaster's offenses in 1993. The rationale behind the diminished-capacity defense is that mental illnesses and disabilities can cause a person, though legally sane, to lack the specific intent necessary to commit certain crimes. *Carpenter*, 627 N.W.2d at 280. In recent decades, the scientific community's knowledge and understanding of mental illnesses has greatly increased. *See* Surgeon General David Satcher, U.S. Dep't of Health & Human Servs., *Mental Health: A Report of the Surgeon General* 3 (1999), http://www.surgeongeneral.gov/library/mentalhealth/pdfs/c1.pdf ("This first Surgeon General's Report on Mental Health is issued at the culmination of a half-century that has witnessed remarkable advances in the understanding of mental disorders and the brain . . . ."). And these scientific advancements have worked to provide *greater* support for the diminished-capacity defense, not lesser. *See, e.g.*, Thomas L. Hafemeister & Nicole A. Stockey, *Last Stand? The Criminal Responsibility of War Veterans Returning from Iraq and Afganistan with Posttraumatic Stress Disorder*, 85 Ind. L.J. 87, 126-28 (2010) (explaining that, as the understanding of Posttraumatic Stress Disorder (PTSD) has increased, "[r]ecent cases illustrate that some courts are willing to consider PTSD evidence . . . to rebut the prosecution's claim that the defendant had the requisite mens rea for a charged crime").

Moreover, as discussed above, the status of the diminished-capacity defense in 1993 cannot fairly be described as having "only the most tenuous foothold" in Michigan law. It had been recognized by the Michigan Court of Appeals many times, both before and after the 1975 codification of the insanity defense, and both before and after the 1994 amendments to that statute. Although the Michigan Supreme Court did not squarely address the validity of the defense until 2001, the Court had clearly acknowledged the defense in several of its previous rulings. Diminished capacity was also a recognized defense in the Michigan State Bar's Standard Criminal Jury Instructions. And, most importantly, it was widely used by defendants in the years prior to 2001. So widely used and accepted, in fact, that Lancaster himself was allowed to pursue the defense during his first trial in 1994. Accordingly, the holding in *Rogers* is inapposite to this case.

### 3.     *The abolition of the diminished-capacity defense was unforeseeable*

Lancaster could not have reasonably foreseen in 1993—when his crime was committed—that the consistent line of Michigan Court of Appeals' decisions upholding the diminished-capacity defense would have been overturned before his retrial in 2005. *See Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964) ("When a state court overrules a consistent line of procedural decisions with the retroactive effect of denying a litigant a hearing in a pending case, it thereby deprives him of due process of law in its primary sense of an opportunity to be heard and to defend (his) substantive right." (internal quotation marks omitted)). The fact that the precedent is from Michigan's intermediate appellate court rather than the state's highest court does not diminish its significance. This point was recognized by the United States Supreme Court in *United States v. Lanier*, 520 U.S. 259 (1997), where the Court held "that decisions of the Courts of Appeals and other courts" could provide "fair warning" of what is proscribed by a criminal statute. *Id.* at 268-69.

In *Rathert v. Galaza*, 203 F. App'x 97 (9th Cir. 2006), the Ninth Circuit applied *Lanier* to the California Supreme Court's interpretation of a criminal statute. Rathert, convicted of burglary in a California state court, petitioned for federal habeas relief

under 28 U.S.C. § 2254 because "the California Supreme Court [had] retroactively abrogated a specific intent requirement established by a decade old, uncontradicted, and controlling [intermediate] appellate court case." *Id.* at 99. The Ninth Circuit granted the petition, holding that "the California Supreme Court unreasonably applied clearly established United States precedent" that prohibited the retroactive application of an "unforeseeable judicial enlargement of a criminal statute." *Id.* at 98-99.

Here, the intermediate-appellate-court precedent was much more robust than in *Rathert*. Indeed, numerous uncontradicted Michigan Court of Appeals' rulings recognized diminished capacity as a defense over the course of 28 years—almost triple the 10-year span that existed in *Rathert*. And the Michigan Court of Appeals, unlike California's courts of appeals, serves the state as a whole. *See* Mich. Const. art. VI, § 1 ("The judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, [and] one court of appeals . . . .").

Furthermore, the question at the heart of the foreseeability analysis is whether Lancaster had been deprived of the "due process of law in its primary sense of an opportunity to be heard and to defend (his) substantive right." *Bouie*, 78 U.S. at 354. The Michigan Court of Appeals' decision in *People v. McRunels*, 603 N.W.2d 95 (Mich. Ct. App. 1999), provides strong support for how retroactively applying *Carpenter* adversely affected the fundamental fairness of Lancaster's trial.

In *McRunels*, the defendant was charged with assault with intent to commit murder for acts that occurred in 1993. McRunels asserted the insanity defense at his jury trial. The trial court, however, retroactively applied the 1994 amendments to the codified insanity defense and required McRunels to prove his insanity by a preponderance of the evidence. At the time that McRunels committed the alleged acts, however, the insanity defense was still governed by the common-law burden of proof, which required the government to prove beyond a reasonable doubt that McRunels was not insane once he presented evidence in support of the argument that he was.

Under the new and more stringent evidentiary standard, the jury rejected McRunels's defense of insanity and found him guilty. McRunels appealed, arguing that

the trial court had erred in instructing the jury to apply the newly enacted burden of proof. His appeal was reviewed under the plain-error standard because he had failed to object to the jury instruction at the time that it was given. For an error to warrant reversal under the Michigan (and federal) plain-error standard of review, the error must have "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 97; *accord United States v. Young*, 470 U.S. 1, 15 (1985).

The Michigan Court of Appeals concluded that altering the burden of proof was a substantive change to the law, and that its retroactive application violated the Ex Post Facto Clause. It also determined that the Ex Post Facto Clause violation seriously affected the fairness, integrity, or public reputation of the judicial proceedings. The court therefore reversed the judgment and remanded the case for a new trial using the old common-law burden of proof. We believe that the 2001 judicial elimination of the diminished-capacity defense here was just as unforeseeable to Lancaster in 1993 as was the statutory alteration in the burden of proof for insanity in *McRunels*, and at least as substantive.

**C.      The retroactive application of *Carpenter* was an unreasonable application of clearly established Supreme Court precedent**

Having determined that *Carpenter*'s abolition of the diminished-capacity defense was unforeseeable, we must next decide whether the Michigan courts' retroactive application of *Carpenter* to Lancaster's retrial in 2005 was an unreasonable application of clearly established United States Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).

Without question, the Supreme Court has clearly established that the unforeseeable judicial enlargement of criminal statutes, if applied retroactively, would violate a defendant's right to due process. *See, e.g.*, *Rogers v. Tennessee*, 532 U.S. 451, 462 (2001); *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964). The Michigan Court

of Appeals acknowledged as much in the last substantive opinion that it issued in this case:

> In criminal cases, . . . due process concerns prevent retroactive application [of court decisions] in some cases. This is especially true where the decision is unforeseeable and has the effect of changing existing law. But retroactive application does not implicate due process or ex post facto concerns where the decision does not change the law and is not unforeseeable.

*People v. Lancaster*, No. 263483, 2006 WL 3751420, at *1 (Mich. Ct. App. Dec. 21, 2006) (per curiam) (unpublished opinion) (citations omitted). Following these principles, the court then held that *Carpenter* "did not involve a change in the law because it concerned an unambiguous statute that was interpreted by the Supreme Court [of Michigan] for the first time." *Id.*

We find this application of *Bouie* and *Rogers* objectively unreasonable. It ignores Michigan's codified court rules that regard published opinions of the Michigan Court of Appeals as binding precedent unless overturned by the Michigan Supreme Court. *See* Mich. Ct. R. 7.215(C)(2) (explaining that published Michigan Court of Appeals' opinions "ha[ve] precedential effect under the rule of stare decisis"). The Michigan Court of Appeals' assertion that the reversal of several decades of its own precedent was not a "change in the law" thus belies the Michigan Supreme Court's own rules. Moreover, the Michigan Court of Appeals' determination that the 1975 insanity-defense statute unambiguously abolished the diminished-capacity defense similarly disregards all of its own cases upholding the diminished-capacity defense even after the enactment of that statute. The Michigan Court of Appeals' decision in this case, therefore, was an objectively unreasonable application of clearly established United States Supreme Court precedent.

**D.     Lancaster was prejudiced by the retroactive application of *Carpenter***

Finally, the State argues that even if the retroactive application *Carpenter* violated Lancaster's right to due process, the violation was harmless. But the State failed to raise this issue in the district court and has therefore waived it on appeal. *See*

*Keith v. Bobby*, 618 F.3d 594, 599 n.4 (6th Cir. 2010) (ruling that a party in a habeas case waives an argument on appeal by failing to raise the same argument before the district court).

And even assuming arguendo that the State has not waived this argument, it would still fail. Preventing a defendant from presenting his only viable defense at trial is so prejudicial that holding the violation harmless would suggest that almost no constitutional violation would warrant reversal. *See, e.g.*, *Crane v. Kentucky*, 476 U.S. 683, 687 (1986) (explaining that a defendant has a "fundamental constitutional right to a fair opportunity to present a defense"); *Rockwell v. Yukins*, 341 F.3d 507, 517 (6th Cir. 2003) ("The [Supreme] Court has long held that an accused's right to establish a defense is a fundamental element of due process." (internal quotation marks omitted)).

The district court briefly addressed the issue of harmlessness, even though the issue was not raised by either party, and concluded that, because the jury in Lancaster's first trial convicted him despite his defense of diminished capacity, the later bench trial would have yielded the same result even if the defense had been allowed. This reasoning, however, ignores the fact that the jury trial was impermissibly tainted by a *Batson* violation and, as a result, the jury's verdict had to be vacated. To rely upon the conclusion that the jury reached, despite the discriminatory means used to select the jury, would negate the very reason for vacating the first conviction and would allow the *Batson* violation to once again affect the outcome of Lancaster's case. We are therefore not persuaded by the district court's analysis on this issue.

## III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the decision of the district court and **GRANT** Lancaster's petition for a writ of habeas corpus unless the State commences a new trial within 180 days of this Opinion in which Lancaster is permitted to assert the defense of diminished capacity.

---

**DISSENT**

---

ALICE M. BATCHELDER, Chief Judge, dissenting. I respectfully dissent from the majority's decision because Lancaster has not overcome AEDPA's very high standard to establish that the Michigan Court of Appeals's determination was an unreasonable application of or contrary to Supreme Court precedent. Before obtaining habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). Lancaster challenges the Michigan Court of Appeals's denial of his due process claim, arguing that it unreasonably applied or issued a decision contrary to *Rogers v. Tennessee*, 532 U.S. 451 (2001). *Rogers* holds that "a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" 532 U.S. at 462 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964)). Although the Michigan Court of Appeals did not expressly apply this rule, the court rejected Lancaster's due process claim, finding that the application of *Carpenter*'s abolishing of the diminished-capacity defense to Lancaster's second trial did not violate his due process rights. Giving the Michigan Court of Appeals's determination the benefit of the doubt required under AEDPA's highly deferential standard, *Slagle v. Bagley*, 457 F.3d 501, 514 (6th Cir. 2006) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)), I cannot agree that it was objectively unreasonable.

The majority concludes that the Michigan Court of Appeals unreasonably applied *Rogers* and *Bouie* when it held that *Carpenter* did not involve a change in the law that was susceptible to a due process challenge. However, the majority's concern rests not on the Michigan Court of Appeals's application of *Rogers* and *Bouie*, but on that court's

application of Michigan law. In concluding that *Carpenter* did not constitute a change in Michigan law, the court of appeals applied Michigan state law; it did not apply *Bouie*, *Rogers*, or any other Supreme Court precedent. *See Michigan v. Lancaster*, No. 263483, 2006 WL 3751420, at *1 (Mich. Ct. App. Dec. 21, 2006) (citing *Michigan v. Doyle*, 545 N.W.2d 627, 636 (Mich. 1996), as holding that under Michigan law, the first interpretation of an unambiguous statute is not a change in law for the purposes of *ex post facto* and due process concerns). Although it seems illogical for the Michigan Court of Appeals to ignore the practical consequences of *Carpenter* and conclude that abolishing the diminished-capacity defense was not a change in law, that conclusion is not relevant to our review because it was based on state, not federal, law. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Instead, we must determine if the Michigan Court of Appeals's adjudication of Lancaster's due process claim contradicts clearly established Supreme Court precedent. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Murphy v. Ohio*, 551 F.3d 485, 505 (6th Cir. 2009) ("[A] state-court decision can be found reasonable as long as neither the reasoning nor the result of the decision contradicts United States Supreme Court precedent." (internal quotation marks omitted)). Because the court's conclusion is consistent with *Rogers* and *Bouie*, it was not "so lacking in justification" as to entitle Lancaster to habeas relief. *See Harrington*, 131 S. Ct. at 786–87.

The Michigan Court of Appeals's denial of Lancaster's due process claim was reasonable primarily because the diminished-capacity defense was not well-established in Michigan and its elimination was, therefore, foreseeable. Under *Rogers*, the retroactive application of a judicial alteration of common law violates due process only when the alteration was unexpected and indefensible. *Rogers*, 532 U.S. at 462 (quoting *Bouie*, 378 U.S. at 354). In Lancaster's case, *Carpenter*'s abolishing of the diminished-capacity defense was foreseeable. As the majority notes, diminished capacity arose in 1973, but Michigan courts chose to discuss diminished capacity not as a separate defense, but rather as an aspect of insanity. When the legislature codified insanity as a defense in 1975, it omitted any reference to a lower-capacity standard, and Michigan

courts issued "a series of decisions continuing to address [the] diminished capacity defense as a form of the statutory insanity defense." *Michigan v. Carpenter*, 627 N.W.2d 276, 282 (Mich. 2001). And when the legislature amended the insanity statute in 1994, it still did not include any reference to diminished capacity. Surely the legislature's choice not to codify diminished capacity is more significant than the state bar association's choice to include it in its publication of standard jury instructions. Simply put, prior to *Carpenter*'s official elimination of the defense, neither the Michigan legislature nor the Michigan courts gave diminished capacity standing as a separate defense. Instead, the courts discussed diminished capacity as an aspect of insanity, and they applied the concept through the parameters of the insanity statute.

It is indisputable that defendants were able to raise the defense prior to *Carpenter*, but the availability of the defense alone does not make its elimination unexpected. Indeed, in *Rogers*, the year-and-a-day rule had been available to defendants for nearly one hundred years, but the Supreme Court nevertheless concluded that its elimination was foreseeable because the rule never served as the basis for a decision in the state and many other states had abolished the rule. In Michigan, diminished capacity likewise never served as the basis for any court's decision. Even in *Michigan v. Griffin*, 444 N.W.2d 139 (Mich. 1989), the Michigan Supreme Court's remand for an evidentiary hearing to determine if counsel was ineffective for failing to raise diminished capacity as a defense reemphasizes only the point that the defense was available. It does not indicate that the defense was so well established that its elimination was unexpected.

The majority attempts to distinguish *Rogers*'s holding by arguing that "none of the United States Supreme Court's reasons for concluding that the elimination of the year-and-a-day rule was foreseeable pertain to Michigan's diminished capacity defense." In reaching this conclusion, however, the majority overlooks the fact that several states have expressly abolished the use of the diminished-capacity defense in many contexts[1]—a factor the Court looked to in *Rogers* to determine whether a rule's

---

[1]*See, e.g.*, Cal. Penal Code § 25(a) (2011); *Mincey v. Head*, 206 F.3d 1106, 1139 (11th Cir. 2000) (applying Georgia law and recognizing that no state court has adopted the defense); *Barnett v. Alabama*, 540 So. 2d 810, 812 (Ala. Crim. App. 1988); *Arizona v. Laffoon*, 610 P.2d 1045, 1047 (Ariz. 1980);

elimination was foreseeable. Although due process does not require that a defendant be aware of the law of other states, the Supreme Court stated that "the fact that a vast number of jurisdictions have abolished a rule that has so clearly outlived its purpose is surely relevant to whether the abolition of the rule in a particular case can be said to be unexpected and indefensible by reference to the law as it then existed." *Rogers*, 532 U.S. at 464.

Moreover, the majority ignores the Supreme Court's main concern in *Rogers*—whether the retroactive application of the change in law was "an exercise of the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect." *Id.* at 467. *Carpenter* abolished the diminished-capacity defense nearly five years before Lancaster's second trial. In my view, applying *Carpenter* to Lancaster several years after it was handed down was neither unfair nor arbitrary, especially when Lancaster was able to argue insanity under the still-available insanity statute. The majority's reliance on *Michigan v. McRunels*, 173 N.W.2d 95 (Mich. Ct. App. 1999), to argue the contrary is misplaced because *McRunels* is not instructive on the issue of foreseeability. In *McRunels*, the court considered the retroactive application of a statutory, rather than a judicial, change in the law; therefore, the court never considered whether the change was foreseeable. *See McRunels*, 603 N.W.2d at 99–102; *see also Rogers*, 532 U.S. at 459–62 (explaining that retroactive applications of statutory changes in law are analyzed under *ex post facto* principles while judicial changes are analyzed "in accordance with the more basic and general principle of fair warning"). Accordingly, *McRunels* is materially distinguishable, and the majority's reliance on it to illustrate forseeability is incorrect. Considering other jurisdictions' elimination of the

---

*O'Brien v. United States*, 962 A.2d 282, 300–01 (D.C. 2008); *Hodges v. Florida*, 885 So. 2d 338, 352 n.8 (Fla. 2003); *Hawaii v. Klafta*, 831 P.2d 512, 73 Haw. 109, 117 (Haw. 1992); *Cardine v. Indiana*, 475 N.E.2d 696, 698 (Ind. 1985); *Iowa v. Plowman*, 386 N.W.2d 546, 548 (Iowa Ct. App. 1986) (stating that the defense is not available for general intent crimes); *Kansas v. Pennington*, 132 P.3d 902, 908 (Kan. 2006); *Louisiana v. Thompson*, 665 So. 2d 643, 647 (La. Ct. App. 1995); *Maryland v. Greco*, 24 A.3d 135, 144 (Md. Ct. Spec. App. 2011); *Massachusetts v. Finstein*, 687 N.E.2d 638, 640 (Mass. 1997); *Cuypers v. Minnesota*, 711 N.W.2d 100, 105 (Minn. 2006); *Stevens v. Mississippi*, 806 So. 2d 1031, 1051 (Miss. 2001); *North Carolina v. Adams*, 354 S.E.2d 338, 343 (N.C. Ct. App. 1987); *Ohio v. Wilcox*, 436 N.E.2d 523, 533 (Ohio 1981); *South Carolina v. Santiago*, 634 S.E.2d 23, 163 (S.C. Ct. App. 2006); *Tennessee v. Grose*, 982 S.W.2d 349, 353 (Tenn. Crim. App. 1997); *Davis v. Texas*, 313 S.W.3d 317, 328 (Tex. Crim. App. 2010); *Keats v. Wyoming*, 115 P.3d 1110, 1119 (Wyo. 2005).

diminished-capacity defense, the length of time between *Carpenter* and Lancaster's second trial, and the lack of independent standing that the defense had in Michigan—each of which were considerations of the Court in *Rogers*—the principles of *Rogers* indicate that *Carpenter*'s abolishing of the defense was not unexpected.

Because the elimination of the diminished-capacity defense in Michigan was neither unexpected nor indefensible, the Michigan Court of Appeals's adjudication of Lancaster's due process claim was consistent with Supreme Court precedent. Accordingly, it was not so lacking in justification as to entitle Lancaster to habeas relief under AEDPA's strict standard, and, therefore, I must respectfully dissent.